Please proceed when you're ready. Good morning, Kevin Fong representing Appellant Teck Metals. I'd like to reserve five minutes for rebuttal. May it please the court. All right. Let me begin with the statutory definition of disposal. CERCLA expressly incorporates the definition of disposal from RCRA. The Resource Conservation and Recovery Act. CERCLA provides that disposal shall have the meaning provided in RCRA. Thus, Congress chose to import the RCRA meaning of disposal. Under that RCRA definition, a disposal is a discharge of This RCRA definition goes on to provide that the discharge must be, quote, so that such solid waste or hazardous waste may enter the environment or be emitted into the air. So in the Center for Community Action case, which I'll refer to as the rail yard case, this court held that there is a disposal if solid waste is first placed on land or water and is thereafter emitted into the air. But on the other hand, there is no disposal if solid waste is first emitted into the air and then travels on to land or water. The allegations in the rail yard case were similar to those here. The plaintiffs alleged that the railroad defendants had allowed particulate matter. So are you talking community? Yes. So you said similar, which when I say similar, does that, is it your position that community can or cannot be distinguished? Cannot be distinguished. Well, I know everyone's going to tell us how clear this is, but probably if there's anything that's going to come out to me after how you both state what clarity is, is that there is ambiguity. So I want, I understand what you're saying, the, your interpretation of disposal, but I want to ask you, why doesn't your interpretation of disposal to not include conduct that first puts a substance in the air before it reached the ground, render CERCLA's federally permitted release provisions superfluous? The federally permitted release provision is designed to protect current owners and operators. There's no mention of the term disposal. So regardless of which way the court rules in this case, the federally permitted release exemption remains operative to protect current owners. And disposal, you know, really doesn't matter one way or the other as to federally permitted releases by current owners. So you're reading it very narrowly then? According to its terms, narrowly, but according to its terms. Well, I do have a question if, to me, if it, if anything's clear is the term disposal is ambiguous. So why shouldn't we regard the interpretation advanced by the United States as a tiebreaker, even though it's set forth in an amicus brief? The government's interpretation is inconsistent with not only the text, but also the context and structure of CERCLA. One good example is the definition of the term facility. So the definitions of facility and disposal are very, very similar with one important exception. There are six key words that are in the definition of disposal, thus making the definition of disposal narrower. So let me explain. CERCLA defines a facility to include any site where a hazardous substance has been deposited or placed, and here are the key six words, quote, or otherwise come to be located. That's for facility. But in contrast, the definition of disposal, which is what we're looking at in this case, does not include those six words. Disposal does not look to whether there was a deposit, quote, or otherwise come to be located. That language just doesn't appear in the definition of disposal. Now Congress could have included that language that it had used in the broad definition of facility, but it chose instead to simply adopt the narrower RCRA definition of disposal. So that's one data point from the context and structure of CERCLA, not RCRA, from CERCLA that's quite persuasive. Here's the other one. Under plaintiff's view, disposal would be a way of settling from the atmosphere. Because of this, current landowners could not be able to invoke the innocent landowner's defense under plaintiff's view. They just couldn't assert that they had acquired the property after the disposal of hazardous substances, because the hazardous substances would still be coming down in perpetuity. Plaintiff's view would effectively wipe out that innocent landowner defense. And that's something that the Carson Harbor en banc decision in 2001 rejected. It rejected a very, very similar argument. And also as the National Mining Association amicus brief points out, the year after Carson Harbor in 2002, Congress adopted the Brownfield Act, which contains an even richester provision. That would similarly be wiped out by the plaintiff's reading of disposal. You just couldn't claim that defense under plaintiff's reading because you would never have acquired after the disposal. The disposal would be ongoing and continuing. Now plaintiff's only response to that is that it doesn't matter. It doesn't matter much because landowners could instead invoke what they call the third-party defense. But that argument doesn't justify a statutory construction which would have this court negate an entire provision that Congress has put into CERCLA. How long has this case been going on? About 10 years. And how long will it go on into the future? It's about halfway done. So has any effort been made to mediate the differences between your client and the government? I think sometime during the 10 years there have been attempts to settle whether it involved a formal mediation by this court's office or not. I'm not quite sure, but it's obviously something the parties have considered. Okay, because this case is going to go back and go forward however we rule on this particular interlocutory appeal. Absolutely. Go ahead. If it's been going on this long, it's odd to me that there isn't anything out there that the agency hasn't done any regulations that they would be entitled to Chevron deference on. Is this such a one-off? No regulation is entitled to Chevron deference. This is not a Chevron deference case. So the court doesn't have that out. But it doesn't seem like it's a one-off type case. It seems like there would be a lot of things in the air that would be landing somewhere. I have a theory. In the numerous cases cited by the government in particular, they managed to take care of the problem of settled air emissions on a site or facility because they could just go after the current owner or operator under 107A1. So if you have a refinery, a power plant, or a smelter on a surplus site, that source is going to be liable as a current owner-operator. They don't need to go down the road of arranger liability. They already have a way of taking care of it. And that may be why you don't see any published cases holding a party liable under arranger theory because the government always has available to it the current owner or operator liability under 107A. That's my theory. One more footnote, and then I think I really do want to reserve my time for rebuttal. I actually think plaintiffs are wrong in suggesting that the innocent party or innocent landowner defense and the third-party defense are totally different. If you look at CERCLA section 101 sub 35, by its terms, the innocent landowner provision is inextricably tied to the third-party defense. So if the innocent landowner defense is not available to a purchaser because of plaintiff's theory, then the third-party defense is also unavailable. I'd like to reserve my remaining time for rebuttal. Good morning, Your Honors. Andrea Fitz on behalf of the State of Washington. I'm going to take the first nine minutes. Your Honors, in my view, the reason why we don't have EPA promulgating regulations on this matter is that it's been abundantly clear to the agency and the environmental bar for the last 36 years that the plain terms of the statute focus on what happens when material hits the ground. And this court's analysis in the Carson Harbor case focuses on that relevant point of analysis. But if you look at in Center for Community Action, we concluded in that that disposal, quote, unquote, occurs where the solid waste is first placed into or on any land or water and is thereafter emitted into the air. Are you arguing that this conclusion was just dicta? Do you have to argue that it's dicta if that case doesn't control here? Well, I think it's important to look at the issue that was being analyzed by the court in the BNSF case, as I call it, versus the issue here. And I would maintain they are different issues and they do not lead to inconsistent results. In the BNSF court case. Well, but if you just say, okay, one's a railroad and the other isn't, if that's the only distinction you can make, that's sort of like saying, well, one person was wearing a yellow shirt and the other one was wearing a red, but therefore it doesn't apply. So, I mean, you're going to have to do better than that. I hope I can do better than that. I think what the BNSF court was focused on is the question, because the plaintiff's case, the way they pleaded it, forced the court to look at this issue, whether something emitted initially into air and resulting in endangerment created by a direct inhalation pathway before it hit the ground could constitute disposal under RCRA. The court said no. The waste first has to hit ground or water before you have a legal disposal. Now, in common parlance, what comes out of the stack might be understood as a disposal, but legally under the terms of the statute, it's when solid or hazardous waste is dumped or spilled or deposited into or on any land or water. At that point, we have a legal disposal. And the Carterson Harbor case goes through the whole analysis, the seminal case of this circuit, as to how you look at the movement of contaminants and whether it fits any of those seven plain terms when waste comes into contact with soil or water. The problem in BNSF is the plaintiffs wanted to get around the Clean Air Act and directly regulate railroad emissions. The way they tried to do that under RCRA was to get the court to say, actually disposal starts when it leaves the stack, before it hits the ground or water. We're not arguing that in this case. I know you're not arguing it, but the court said that. And so are we bound by that? That's the problem. I don't believe this court is bound on it. Because a three-judge panel can't change what another three-judge panel said, even if maybe they shouldn't. They didn't need to say it to come to a conclusion, but they did say it. So what do we do with it? Well, Your Honor, I would submit it's not entirely clear that they meant to announce a bright-line rule, for a couple of reasons. Well, we don't always. We have unintended consequences, but sometimes it doesn't make it any less binding. Well, I'll give you three reasons why I say that. Number one is that understanding the context of the case, the court would have to rearrange the words of the statute in order to find that something that came out of the stack but had not yet hit the ground constituted disposal. I understand the court's statement in that context. They're addressing the unique circumstances of the case. Secondly, the court indicated that the power engineering case was not to the contrary, but in power engineering, material unquestionably passed first through the air before it being deposited onto land or soil. It was emitted from 1992 onward, subject to an air pollution discharge permit. That's a Tenth Circuit case, so even if the court ran afoul of that, it wouldn't matter because it's not bound by a Tenth Circuit case, right? But my point, Your Honor, is that Tech is trying to argue there's a bright-line rule, and it's not so clear to me that the court meant to announce a bright-line rule. The third factor is this. For the court to announce this rule that passage through air before hitting land or soil negates disposal, you are now having to read words into the statute that Congress didn't write. And Tech, in its reply brief, says, well, in the power engineering case, it was a short distance, so I guess that really doesn't matter. I don't know where the court starts to draw that line. If I carry a barrel of waste through the air before dumping it, I think by Tech's argument, this passed through the air first and negates the disposal. If you have something entering water through a discharge pipe that first passes through air, the disposal is now negated. Let's get to the facts of this particular case. What do you see as the difference between what your clients are asking as a disposal and what the plaintiffs in BNSF asserted was a disposal? Because in BNSF, the plaintiffs, the heart of their case was focused on trying to regulate those initial emissions and protect a direct inhalation pathway. We're not concerned about trying to regulate Tech in Canada. Canada can worry about that. We're also not alleging that material as it passes through the air into the United States is yet disposed. We're worried about the effects on the ground. And if we were pleading a RCRA case here, our endangerment would be focused on the effects of material once it's in the soil and once it's in the water, not going back up the chain to things that are outside the scope of the statute, which is exactly what the plaintiffs in BNSF tried to do. Your Honor, I would also submit to you that this case is in a CERCLA context. The Supreme Court has indicated that we need to consider these definitions in context with their statutory framework. The result here of going with Tech's rule is you're going to be construing CERCLA narrowly against the polluter pays principle. And I'm going to point out that we would then create different liability spectrums for the four classes of covered persons. Well, I guess if your best argument is policy, I don't necessarily disagree with you on the policy. But your best argument, I think, to prevail has to be it can be distinguished from BNSF. I think my best argument is this. I think the BNSF case was focused on a different issue, and in the course of addressing a different issue, had language that was, I would submit, fuzzy. It's trying to be extended as a bright line rule by Tech. But I think the seminal thing for this panel is to look to the en banc Carson-Harbor decision. And we are on all fours with that case. You look at how the court set out the framework to analyze disposal. You look at the common meaning of each of the seven terms. One of those seven terms is deposit. Common meaning is to precipitate or settle or let fall. The key question is where do you analyze that? And it's in relation to any of those seven terms with respect to contact with land or water. Here we have that. Can we go to the fourth amended complaint? On ER 84, it talks about air emissions. How does that differ from BNSF? Because it says at paragraph 4.2 that Tech emitted certain hazardous substances into the atmosphere through the stacks. So that sounds a lot like what BNSF was talking about. Your Honor, I'd submit that the key words are at the end of that paragraph, resulting in the disposal of airborne hazardous substances into the Columbia River site. In other words, making contact with land and water. But you can't ignore the predicate language. It says it was emitted into the air, then traveled through the ‑‑ discharged into the atmosphere, and then traveled through the air. How is that different? Your Honor, I'd submit that the first part is no different than alleging that an arranger had trucks with barrels of waste drive to the site from which someone picked up the barrel, carried it over, and dumped or spilled it onto the ground. The key legal fact is that contact with land or water under the terms of the statute. I have a question. Under your definition of disposal, if that's what it is, will property owners who live nearby the smelter that emits hazardous substances through its stacks be liable under CERCLA for cleanup costs after those airborne substances are deposited on their property? Your Honor, I would submit that under the third-party defense in CERCLA, if you have what amounts to a trespass from some ‑‑ So they're liable, but they have to raise a defense? Well ‑‑ Well, I mean, it's kind of like it doesn't make you feel a lot better. You're charged with murder, and you can plead not guilty and be found not guilty. I mean, can you state a case against them? It sounds like you can, if we accept your rule. It would be legally possible. I'd also point to the Carson Harbor at page 884, where it discussed parades of horribles. There is enforcement discretion with EPA, and there are mechanisms under the statute to deal with these de micromis and de minimis situations. Your Honors, I'm out of time. I just have one quick question. What does the allowance of this CERCLA claim give you that you didn't have without it? It allows us to pursue natural resource damages as a trustee, State of Washington, trustee Colville tribes, for airborne ‑‑ the deposition of material into upland soils and waters at the Upper Columbia River site. And your other claims won't do that? No. No, the river claim won't, except to the extent that you have some flooding and deposition of material through that. So we're talking about lead, cadmium, zinc that's harmful to plants and wildlife under our claim. Thank you, Your Honors. Thank you. Good morning, Your Honors. David Galtieri of the Department of Justice on behalf of amicus curiae United States in support of appellees in this case. I think Mr. Fitts did an excellent job of addressing the interpretation that we advance here of the term disposal and addressing some of the major problems with text interpretation of disposal based on the ‑‑ Well, I'm glad to hear from you, but I really do wonder why, you know, if this is such a problem, which I can see where it could be, you know, why hasn't the EPA regulated in this? I mean, and you're here as an amicus, and that's great, and I'm anxious to ask you some questions, but you could be in a brand X situation if the EPA had regulated. Well, I think that's right, Your Honor, and that would be a fortunate situation if that's the way things stood with the regulation. But I think as Mr. Fitts alluded to and as Judge Succo elucidated in his opinion, there have been 30 years of CERCLA practice of addressing smelter sites, refineries, you know, hundreds of sites across the country where allegations are based on the aerial deposition of hazardous substances. But we're not those people. We're not practitioners. We're a court of law, so we have to deal with our precedent. And is there ‑‑ if you don't have anything that's entitled to ‑‑ do you have anything that's entitled to Chevron deference here? We don't. We do not have a regulation defining the term disposal other than the clear terms that Congress provided in addressing that, and I think deposit is the clear term from that statute in the Carson Harbor decision which captures the circumstances of the alleged disposal in this case. And I think if I can just continue a bit on the practice under CERCLA. What about Skid Row, Skidmore deference? Anything on Skidmore? No, we're not claiming deference for any of the positions that we're advancing here. What we have tried to educate the court about, and it was true in the State of California's brief identifying a number of sites and the State of Washington's brief identified sites, there have been sites over the years where the allegations have been based on one of the four categories of responsible parties under CERCLA, an owner and operator at the time of disposal, and those who have arranged for disposal. There are no reported decisions. It's true addressing that point, but I think that's reflective of the fact that the definition of disposal is broad enough to capture those liability scenarios. It hasn't been seriously contested. Wouldn't we have to ignore the decision in BNSF if we agreed with you that the past practice should govern how we decide this case? No, and I'm not making the policy argument either, actually. As our main argument, I'm responding to Judge Callahan's question on that. I think as we identified in our brief, there are a number of ways to address some of that problematic language in the BNSF decision. We think the best way to address it is the way that Mr. Fitz described, is that the proper interpretation of that case is that you have a court responding to an attempt to make an end run around the Clean Air Act citizen supervision and bring really a Clean Air Act case under RCRA. The allegations and the complaints are all about addressing 16 different rail yards all across Southern California, 2 million people. They are worried about the inhalation of pollutants from the ambient air. That is what that case was about. Do you concede that the language I quoted is a little unfortunate for you? I do not concede that because I think if the case is read and interpreted in the manner that we interpret it, and there's one important point to add to what Mr. Fitz had here, that is why the court focused on the word emissions. That is why the court said our statutory analysis is simple here. The word emit is not one of the words used in the definition. The plaintiff is focusing on what's coming out of the rail yard stacks. We are focusing on what's coming out of the rail yard stacks. Emit is not one of those words. End of story. Counsel, as I pointed out to opposing counsel, to your co-counsel, the factual allegations in the Fourth Amendment complaint refer to air emissions. Well, they do refer to air emissions, I think. Oh, in their Fourth Amendment complaint. I would direct you to a different passage in the complaint. I'm sorry, I'm going to have a hard time finding it here. You don't have to rush. Counsel, you don't have to rush. We'll give you time to finish your argument. Thank you, Your Honor. I greatly appreciate that. The Fourth Amendment complaint, I agree Mr. Fitts pointed to an operative paragraph there that was important, but the Fourth Amendment complaint in this case, quite distinct from BNSF, says that the aerial deposition of hazardous substances at the UCR site is the disposal. That is exactly in line with the PCOTUS 1 decision saying that the disposal site, and it's important to note, PCOTUS 1 is not only a case about where is the release and the legally operative release, which Tech has argued in its reply brief. PCOTUS 1 says that the UCR site is the disposal site at the end of that discussion. They did address the question of where disposal is. They did address where various discharges and things have occurred in that case. So the legally relevant place that we're focusing on is the UCR site. That is a site that was determined to be a circle of facility, and if I can just digress for one moment, Mr. Fong pointed to the idea that facility includes the words come to be located, but disposal doesn't. Well, that's a distinction without a difference. You know what word it does include? Deposit. And deposit is the relevant allegation in this case. There has been the aerial deposition of hazardous substances at the site. It's appellate record 98 and 99 is where that allegation appears. I have that remembered, but I don't remember the- Any other questions or other agency documents setting forth the definition of disposal that you advance in this case? Any other? Well, I think we're advancing the definition of disposal that has always prevailed. I mean, really the status quo, looking at the plain language of the statute. And as Mr. Fitz pointed out, CERCLA is a statute that is primarily focused on remediation of the ground, when things have landed on the ground. And those terms, terms like deposit, are certainly broad enough to capture the circumstances that we're addressing here. But the document said that the word disposal should have the same meaning in RCRA and CERCLA. It did. But the Supreme Court has also said, and canons of construction also tell us, that when we're interpreting statutory language, we look at the whole statute. We're talking about a different statute now. Now we're in CERCLA. We're not in RCRA. We need to, and this Court needs to, analyze the term that is at issue in the context of CERCLA. The critical distinction, the critical distinction between the BNSF case and this case is that these plaintiffs have alleged deposit, a different statutory term than was at issue in the BNSF case. The BNSF decision has no discussion whatsoever of the term deposit, other than to cite it back as part of the definition of disposal. The legal issue here for this Court to analyze, as Carson Harbor instructs, the NBank decision in Carson Harbor instructs, you need to take disposal, break it down to its elemental terms, there are seven of them, and see if any of those terms fits the allegation in this case. And here, the allegation is plainly of aerial deposition, deposit at the site. That is one of the terms. It needs to be analyzed in the context of CERCLA. And in our brief, we talk about two decisions, two Supreme Court decisions, recent Supreme Court decisions, saying that the fact that the same term appears in the statute doesn't bind that meaning in all instances in the statute. In the words of the Environmental Defense v. Due Case, context counts. Even if Congress says they're to be defined the same way, that they're to have the same meaning in both statutes? Absolutely. Do you have a case where Congress, a Supreme Court case, where Congress has said that the term is supposed to have the same meaning in both statutes, yet the Supreme Court said they had different meanings? Well, I can go you one better, I think, on that, Your Honor. In the Environmental Defense v. Due Case under the Clean Air Act, we're within the same statute. And in that case, the new source performance standards section of the statute defined the word modification. Years later, Congress wanted to ratchet down requirements under the Clean Air Act and establish the Prevention of Significant Deterioration section. That section says, with respect to modifications, to apply the term as it is defined in the PSD statute. And in that decision, the court ---- But then that's a different definition that's being promulgated by Congress. No, it's the same definition. The definition of modification is used in both sections of the act. And their EPA issued regulations where it interpreted the term modification differently under both of those. And Congress said, and we have a long quote in our brief, or I'm sorry, the Supreme Court said, as we quote in our brief, that the mere fact of a statutory incorporation by reference of a definition is not a signal that those words have to have the same meaning. You still have to go through the process of statutory interpretation. In that case, you had the EPA doing a regulation, which would make this case different. If the EPA had promulgated a regulation, we would be in Chevron deference territory as opposed to trying to distinguish the two. That procedural difference, which I acknowledge is a difference, but I think it's a difference that doesn't matter. Because if tech were correct, and there's a bright line rule, that every time you have a statutory incorporation by reference, game over, it's always going to carry over. Every word for word has to be exactly the same. If that were the case, EPA couldn't have done that. EPA would have lacked the legal authority. We don't even get to deference because EPA has violated a bright line legal rule that you can't do that. I'll point you to another case, the King v. Burwell case, the Affordable Care Act case. In that case, they were analyzing the definition of what is a state exchange. It was a big issue in that case. Justice Roberts interpreted the term differently in different provisions of the statute in the majority opinion. The dissent said, and this gets to the point of stare decisis, the dissent said, well, hold on a minute. That term appears all over the statute. If you interpret it in this way for this one provision, we are going to have to apply that throughout the statute. Justice Roberts' response to that in footnote three of that decision was, no, you don't have to worry about that. Again, you have to go through the process of statutory interpretation. The context of all the provisions of the statute matter and they count. Just because this decision defines it that way, that is not going to bind the application of that definition in subsequent decisions or actions. So there he's saying, as a matter of, this is the Supreme Court definition, you know, that they've elucidated in the decision. He's saying, well, that's not going to be binding going forward. If there's a different section, you still have to do the work. The Supreme Court is in a different position than we are. We are bound by our prior decisions, decisions of a prior panel. So we don't have the luxury of disregarding prior decisions. I think that's right. I want to just make sure I understand your question. I'm understanding your position to be that you say we can reasonably distinguish community or BNSF as not having addressed the term deposit in 42 U.S.C. section 6903. And as this court has held in interpreting the term disposal, courts must examine each of the terms in the definition of disposal in relation to the facts of the case and determine whether the movement of contaminants is under the plain meaning of the terms of disposal. And I guess put otherwise, do any of the terms fit into the hazardous substance contamination in this case, Carson Harbor? So is that kind of what you're saying? I think we're saying two things. And my apologies for speaking too fast. You're not saying that? We're saying two things. We're saying, first of all, better than just the – Are you saying what I – have I said anything? Yes, I think the only way – the only modification I would make to your recounting our position is that we are saying that BNSF doesn't apply. It doesn't address the legal issue before this court. Before you is the question of interpreting whether deposit, the term deposit applies to hazardous substances landing on a circle of facility. In this case, that is not addressed at all in that decision. So I think it's just simply legally inapplicable. It didn't address the issue that is presented before this court. And then I think from there we move to a very long list of things distinguishing that case. And the Supreme Court authority that tells you as this court, you still have to go through the exercise of doing a full-blown statutory interpretation of what disposal means in CERC law in light of the facts of this case. The fact that there's a RCRA decision that is addressing a radically different factual situation. And, in fact, I would say that case is so unique in terms of the end run of trying to get around the Clean Air Act. We've got the panel going on for pages in the legislative history, the differences between RCRA and the Clean Air Act. What is that telling us? They're talking about emissions, what's directly going to the air. What that's telling us is that's the part they care about. It's the Clean Air Act stuff, right? The Clean Air Act doesn't do anything on the ground. We understand that argument. Are there any other questions? Thank you, counsel. Thank you for your patience. In the rail yard case, here is what this court said at page 1023. Quote, in their complaint, plaintiffs allege that defendants dispose of solid waste, specifically diesel particulate matter, by allowing the waste to be transported by air, by wind and air currents, onto the land and water near the rail yards. And then in a footnote, the court says, indeed, in opposing defendant's motion to dismiss, plaintiffs state that the heart of this case is that defendants' rail yards contribute to the disposal, italicized, of a solid hazardous waste, diesel particulate matter. Footnote is that you're reading? Footnote four at page 1023. That tells you all you need to know about what the allegations were and what the core issue was in the rail yard case. Thank you, your honors. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Hawkins, Rawlinson, Callahan